UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:21-CR-13-GFVT-HAI-5 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| KERI McFARLANE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

Defendant Keri McFarlane is a physician who formerly worked for Express Health Care ("EHC"), a multi-site addiction-recovery clinic in East Tennessee. She moves to suppress two of four interviews she conducted with law enforcement prior to being indicted. D.E. 402.

This case stems from a multi-year investigation of EHC on suspicions of pill diversion and accompanying fraud. The underlying facts have been outlined in prior orders. *See, e.g.*, D.E. 391, 392. Eleven defendants are charged with a total of twenty-seven counts, including money laundering, health care and wire fraud, conspiracy to unlawfully distribute controlled substances, falsification of medical records, and various conspiracies. D.E. 1. Defendant Taylor founded EHC and all but two of his co-defendants were EHC employees. *Id*. at 6-7. This is one of several defensive motions filed by the medical-provider defendants in this matter.

## I. Background to the Motion to Suppress

During the government's investigation, McFarlane participated in four interviews. On September 16, 2022, McFarlane filed a motion to suppress two interviews conducted in 2019. D.E. 402. She does not allege that she was in custody or that the government did not comply with

*Miranda*.  Instead, she presents a somewhat novel argument that her statements were involuntarily coerced, implicating her Fifth Amendment right against compelled self-incrimination and her Sixth Amendment right to counsel.  The government responded in opposition.  D.E. 432. McFarlane replied.  D.E. 453.  Following a scheduling teleconference (D.E. 462), the Court conducted an evidentiary hearing on November 2, 2022 (D.E. 507).  The DEA's case agent, Special Agent Jared Sullivan, testified.  The defense had planned on calling McFarlane, but ultimately she decided not to testify.  At the evidentiary hearing, McFarlane submitted as exhibits the reports memorializing her four interviews and a transcript of the third interview.  The audio of the third interview is already in the record (D.E. 431, 443), as is the DEA-6 report of the fourth interview (D.E. 432-1).  The facts are not in dispute.  The undersigned now recommends that McFarlane's motion to suppress be denied.

## A.  First Interview – August 1, 2016

According to McFarlane, after observing "improper and potentially illegal practices" at EHC, she contacted the FBI Knoxville field office and was interviewed there by two agents on August 1, 2016.  D.E. 402 at 2; D.E. 432 at 1-2.  According to the FBI's report, "McFarlane had concerns that her electronic signature was being used to modify patients' records and prescriptions without her knowledge or approval at the Suboxone clinic where she worked, Express Health Care (EHC)."  Ex. 1 at 1.  The report also states, "McFarlane also noted she and several other doctors from EHC had been investigated by the Tennessee Board of Health for having too many patients." *Id*. at 2.

At the time, McFarlane was still working at EHC.  According to McFarlane, she told the FBI agents she wanted to quit, but they encouraged her to provide a sixty-day notice per EHC policy.  D.E. 402 at 2.  The FBI referred the matter to the Department of Health and Human

Services Office of Inspector General ("HHS-OIG").  D.E. 432 at 2; Ex. 1 at 2.

## B.  Second Interview – August 9, 2016

Five days later, McFarlane was interviewed again at the Knoxville FBI field office by an HHS-OIG agent and an FBI agent.  D.E. 402 at 3; D.E. 432 at 2.  She told interviewers she began working full-time at EHC in mid-2014.  Ex. 2 at 1.  Among other things, the report of this interview memorializes that

> [McFarlane] was notified that the Tennessee Department of Health (DOH) was investigating her regarding her practices at EHC.  She has an attorney (Dan Swanson from London and Amburn) related to the DOH investigation.  On approximately July 22, 2016, DOH called her to tell her about the investigation.  They said the investigation was related to the amount she was prescribing, the use of benzoides with Suboxone, and the number of patient she allegedly saw in 2014 and 2015 (l,140 according to their records) when she was supposed to only see 100 patients each year.  She met with her attorney on July 28, 2016 and told him about the issues.

> Suboxone prescribers are only allowed to see 30 patients in their first year, 100 patients in their second year, and 275 patients if they are board certified.  While she was preparing for the meeting with DOH, she started data mining through the EMR system.  She found patients that she did not see but that were listed as if she had seen them.  They were patients from the Jacksboro, TN office with Kentucky Medicaid.

Ex. 2 at 3.  McFarlane told her interviewers that EHC employees were adding her name to records for patients she had not seen so they could be covered by Kentucky Medicaid and that pharmacists were also adding her name to prescriptions from EHC.  *Id*.  The investigative report also notes that McFarlane turned in her EHC resignation letter on August 6, with her last day set for October 5, 2016, and that McFarlane was opening her own urgent-care clinic.  *Id*. at 3; *accord* D.E. 402 at 3.[1]

Meanwhile, the DEA had begun an investigation of EHC.  This investigation went public in December 2018, when search warrants were executed at both Tennessee EHC clinics and the homes of Defendants Taylor/Barnett, Harrell, and Grenkoski.

---

[1] The references to "2019" in paragraph 9 of McFarlane's motion are clearly typos intended to indicate 2016.

### C. Third Interview – March 19, 2019

On March 19, 2019, DEA Special Agent Jared Sullivan ("SA Sullivan") and DEA Diversion Investigator Mike Hughes ("DI Hughes") approached McFarlane at her new place of business and conducted a follow-up interview. D.E. 401 at 3; D.E. 432 at 2. It was two hours, 40 minutes long. D.E. 432 at 3. Of the four interviews, this is the only one that was recorded. *See* D.E. 431, 443 (conventional exhibit). The DEA prepared a transcript, which was entered as Exhibit 4 at the evidentiary hearing.

McFarlane explains in her motion:

> 13.    During the third interview, SA Sullivan and DI Hughes made various statements to Dr. McFarlane that reinforced Dr. McFarlane's status as a mere witness in the investigation. The investigators affirmatively told Dr. McFarlane, [00:01:28] "You're under no obligation, but we would love to see if we could use you as a witness," and [2:19:09] "you're potentially my star witness." 3/19 DEA Interview Recording.

D.E. 402 at 3-4. She states the interviewers led her to think she was not a "target," providing the following transcription:

> [00:01:28] "You don't have to talk to us today if you don't want to. You're not obviously under arrest. I'm not reading you your rights or anything like that. It's important that you understand that you don't have to, you're under no obligation, but *we would love to see if we could use you as a witness* . . . [00:02:31] We are going through and interviewing every single one of the former physicians so it's not just you . . . [2:19:09] *You're potentially my star witness* . . . [02:21:34] I understand. No one is sitting here throwing rocks, I just gotta [sic] get a fair assessment . . . [02:39:39] I really appreciate you being forthcoming . . . [2:42:20] We wouldn't be doing our due diligence if we didn't at least talk to everybody."

*Id.* at 8. She continues,

> 14.    The investigators also indicated that other EHC physicians, not Dr. McFarlane, were the targets of the investigation: [02:30:16] "It's clear, I don't think I'm letting the cat out of the bag, that Herrell and Taylor are targets of this investigation." 3/19 DEA Interview Recording.

> 15.    Dr. McFarlane believed this interview was an extension of initial interviews with the FBI and the OIG HHS . . . . Relying on this belief and the fact

that SA Sullivan had respectfully told her multiple times that she was not a target, Dr. McFarlane fully cooperated with the DEA investigators' line of questioning. Furthermore, when the agents left, Dr. McFarlane provided them with a flash drive containing all the emails she still possessed from her time at EHC and volunteered to keep them updated with any new developments.

*Id.* at 3-4.

As the government points out, McFarlane in this interview described EHC as a "pill mill"

that was seeing "ridiculous" numbers of patients and presenting "red flags" of drug diversion. D.E.

432 at 3-4. The government continues with its own quotes from the interview:

SA Sullivan expressed concern about the length of time McFarlane remained at the practice despite knowing about the problems she described. In that context, SA Sullivan had the following exchange with McFarlane:

McFarlane: I think, when we first started, we didn't know. But I think once we learned and how to do it and we got good at it and we got educated about it, there should have been nobody on 3 a day.
. . .

SA Sullivan: From somewhere in 2015 on, you're saying?

McFarlane: Yeah.

SA Sullivan: And so, all the last 3 years.

McFarlane: Yeah.

SA Sullivan: The signs have been there, and actions have not been taken?

McFarlane: Yeah.

SA Sullivan: Okay . . . What is my argument going to be, cause you're potentially my star witness.

McFarlane: Oh great.

SA Sullivan: I don't know that we'll ever go to court, no one has been charged, you know. We're in the fact-finding phase, but what would the argument be from the defense attorney, who says to me well she made a million dollars there. She certainly knew everything that was going on.

[Ex A: March 19, 2019 Interview Recording at 2:18:34.] McFarlane responded that

she did not "know about addiction" when she started at EHC and that she learned from Robert Taylor. [*See id.* at 2:19:25.] SA Sullivan continued on the same subject, asking how long McFarlane worked at EHC after knowing about the problems there:

> SA Sullivan: The question is when you . . . how long did you work there from when you knew something's not right until you quit? I know you said there were 3 months where you had to put in, right?
>
> McFarlane: I had to put in.
>
> SA Sullivan: Cause I-I, I think you worked there in 2016, in some degree.
>
> McFarlane: Yeah, I worked until October.
>
> SA Sullivan: October '16?
>
> McFarlane: Ah, yeah October '16.
>
> SA Sullivan: So, '15 is where the alarm started going off. So, why a year?
>
> McFarlane: Yes.
>
> SA Sullivan: I mean, you worked there about basically a year where the alarms are going off.
>
> McFarlane: Right, because I had bought land and I was trying to get this place up and running . . .

[*Id.* at 2:20:34.]

Shortly after that exchange, McFarlane claimed her prescribing changed in her last year at EHC, prompting SA Sullivan to ask McFarlane if she felt "pressured . . . [t]o prescribe the others and keep it afloat," to which McFarlane responded affirmatively and said, "I have, I mean, a mortgage to pay." [*Id.* at 2:21:09.] This prompted the following exchange:

> SA Sullivan: I-I understand and nobody's sitting here throwing rocks. I just gotta get a fair…
>
> McFarlane: Yeah.
>
> SA Sullivan: Assessment.
>
> McFarlane: When, when they're, you know, coming to you and going you don't want to go back to the ER, and you know and blah, blah, blah, you

better //U//.

SA Sullivan: They have power over you.

McFarlane: Absolutely.

SA Sullivan: It was a well-paying job.

McFarlane: Yeah.

[*Id.* at 2:21:26.]

The interview progressed, with McFarlane continuing to discuss her role at EHC and recounting an instance in 2015 in which Taylor allegedly confronted her about her role at the practice. [*Id.* at 2:28:35.] Later in this exchange, McFarlane stated "I had no say. I had no say in what happened to my patients, I had no say in what happened to, at the clinic." [*Id.* at 2:30:00.] This prompted SA Sullivan to ask: "Do you think, I mean it's, it's clear, I don't think I'm letting the cat out of the bag, that Herrell and Taylor are targets of this investigation. Do you think they are going to pin stuff on you?" [*Id.* at 2:30:07.] McFarlane responded, "probably." [*Id.*]

D.E. 432 at 5-6.

## D. Fourth Interview – September 16, 2019

SA Sullivan contacted McFarlane to set up the fourth and final interview. He told her over the phone that two Assistant United States Attorneys ("AUSAs," Mr. Rosenberg and Mr. Smith) would also be attending. SA Sullivan asked McFarlane if she would like to have her own attorney there. She said she would ask her husband, an FBI agent. She attended the interview without an attorney. D.E. 432 at 7. It was conducted at a different medical office of McFarlane's in Oak Ridge, Tennessee. *Id.* The interview was not recorded, but the DEA-6 report prepared by SA Sullivan is in the record at Docket Entry 432-1.

According to the government:

The undersigned advised McFarlane that she was under no obligation to speak with the United States and that she could stop the interview at any time. [D.E. 432-1 ¶ 2.] The interview proceeded, with McFarlane providing lengthy answers about her observations and experiences at EHC. At the end of the interview, the undersigned explained to McFarlane that the government would be making decisions about who

might be charged in the event of a criminal prosecution and advised McFarlane on some of the considerations that went into those determinations. [*Id*. at ¶ 52.] McFarlane became emotional and expressed that she stayed at EHC because "I was paying bills." *Id*.

D.E. 432 at 7-8.

## II. Legal Standards for Voluntariness

The broad contours of the legal standards for voluntariness are as follows.

Due Process prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992)).

The Sixth Circuit has established three requirements to prove that a confession was involuntary: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

"Coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). Courts must look to the totality of the circumstances to determine whether a defendant's will was overborne in a particular case. *Mahan*, 190 F.3d at 422. Relevant factors include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the

8

questioning; and the use of physical punishment, such as the deprivation of food and sleep. *Id*. at 422-23.

### III. McFarlane's Legal Theory

There is no dispute that McFarlane is a physician who, since leaving EHC, has run her own business, a medical clinic. She is thus a highly educated, sophisticated, and successful professional. At the time of the 2019 interviews, she was 46 and 47 years old. Additionally, she is married to a veteran FBI agent, and she sought her husband's advice as she went to authorities and then attempted to cooperate in the investigation of EHC.

Typically, if a defendant is a mature adult and a highly educated professional with no mental disabilities, the above *Mahan* factors weigh *against* a finding of involuntary coercion. But here, McFarlane takes the somewhat ironic position that her education, intelligence, sophistication, and knowledge of the criminal justice system made her *more susceptible* to being misled in a particular and somewhat novel manner. She argues that because she reasonably believed she was a star witness, she could not become a *target* of the investigation. She argues that the DEA actually considered her a target, but concealed this information, thereby interviewing her under false pretenses and obtaining an involuntary confession.

As she explains in her own words:

> Dr. McFarlane contends that her education and her familiarity with the justice system are among the many factors that led to Dr. McFarlane's will being undermined. . . . It is Dr. McFarlane's position that the coercion displayed by the government agents here is more subtle and unique to this particular case. D.E. 453 at 3.

> Here, Dr. McFarlane is the well-educated wife of an active FBI agent[. McFarlane] had previously given interviews to two separate government agencies involving her time at Express Health Care ("EHC"). Government agents, aware of all these factors and of Dr. McFarlane's actual status as a target, utilized deceptive tactics designed to take advantage of Dr. McFarlane's intelligence and cooperation and baited her into providing hours of incriminating statements. *Id*. at 4.

Dr. McFarlane's belief that she was assisting the government as a witness (rather than incriminating herself as a target) was a crucial motivating factor in her decision to give the March and September 2019 interviews. *Id*. at 1.

Because Dr. McFarlane had previously cooperated with other government agencies, had familiarity with the criminal justice system's labeling of "subjects" versus "targets," had been affirmatively told by government agents that that she would be a witness, and had been told that others [codefendants Drs. Taylor and Herrell] were targets of the investigation, Dr. McFarlane was deceived into believing that she was assisting the government. The agents relied both on Dr. McFarlane's prior assumptions and affirmatively made statements to her to reinforce these assumptions. Meanwhile, the government agents, fully aware of Dr. McFarlane's true status of a target, were surreptitiously recording her with the intent to use the information against her in the future. *Id*. at 4.

Had the agents not used deceptive tactics to dissuade Dr. McFarlane into believing she was assisting the government rather than incriminating herself without counsel present, Dr. McFarlane would have stopped the [March 2019] interview, called her husband, retained an attorney, and received the protection to which she was entitled. Her knowledge of law enforcement procedures and DOJ terminology reinforces that this would have been her decision. *Id*. at 5.

The interviewing agents objectively took advantage of Dr. McFarlane's subjective belief that she was assisting the government by clouding the purpose of their visit, asking Dr. McFarlane to be a witness, and highlighting other [EHC] doctors as targets of the investigation. *Id*. at 6.

Had Dr. McFarlane not been highly educated, had Dr. McFarlane not been married to an FBI agent, had Dr. McFarlane not understood the implications of DOJ terminology, had Dr. McFarlane not believed she was assisting the government, and had the government not taken advantage of all of these circumstances in obtaining the statements, then there would likely be no interviews to suppress. *Id*. at 7-8.

### IV.  Evidentiary Hearing

At the November 17 hearing, the Court heard testimony from DEA Special Agent Jared Thomas Sullivan, who is the case agent on this matter. McFarlane's attorney made clear that he had extensively counseled his client on whether she should testify and fully informed her of the scope of permissible cross-examination and the limitations on use of suppression-hearing testimony at trial. Defense counsel made clear he and his client had made a strategic decision it was in their best interest for McFarlane not to testify at the hearing. The Court confirmed this

directly with McFarlane.

SA Sullivan testified that he investigates crimes and shares his findings with federal prosecutors, but he is not involved in deciding who will be charged and when. He testified he gave the AUSAs in this matter no advice on whom to charge and when and was not privy to the prosecutors' charging decisions.

SA Sullivan testified that EHC came on his radar in late 2016 or early 2017. At the time, the Kentucky Attorney General's office already had concerns about the clinic. Federal prosecutors were involved in the investigation early on, and the covert phase of the investigation culminated in the five search warrants executed in December 2018. SA Sullivan testified that, even then, he had heard no discussion of indictments; there was still lots of investigating to do. He testified that, following the search warrants, he proceeded to interview numerous former EHC employees and patients, and McFarlane was among these.

SA Sullivan testified he was not aware of when or if any of the Defendants in this case obtained counsel. He testified he generally does not interview suspects once they have criminal defense attorneys. He testified he generally records his investigatory interviews, except when there is a lawyer (either a defense attorney or a prosecutor) present. And DEA policy prohibits recording suspects after they are charged.

At the hearing, SA Sullivan was shown the investigative reports of all four interviews. All four were entered as exhibits. He testified that when he first interviewed McFarlane in March 2019, he had already seen the FBI's earlier interview reports. He also already knew her husband was an active FBI agent. He testified that he recorded the March 2019 interview and he or someone in his office produced a transcription, which was entered as an exhibit. He testified that the DEA-6 report of the March 2019 interview is short because there was a recording. The DEA-6 of the

September 2019 interview, which he prepared, is a lengthy and detailed report. He testified McFarlane was very forthcoming, honest, and helpful at both interviews. SA Sullivan did not remember the length of the September interview.

SA Sullivan testified that on March 19, 2019, he went unannounced with DEA diversion investigator Michael Hughes to McFarlane's clinic in Knoxville. She greeted them in the lobby and agreed to an interview. She led them to a break room in the back, where the interview occurred. She was not given *Miranda* warnings and she was not told she was being recorded. As captured in the recording, Sullivan tells her she has no obligation to speak to them, but they are interested in her potential as a witness.

SA Sullivan acknowledged telling McFarlane in the March interview that she was potentially his star witness and that Taylor and Herrell were targets of the investigation. He said that by target, he meant they were the focus of his investigation at the time. He testified that investigations are fluid, and no decisions had been made about charging anybody.

As for "star witness," SA Sullivan testified he made this comment near the end of the over-two-hour interview as it became clear that McFarlane would have some weaknesses as a witness due to the fact she continued to work for EHC despite having seen illegal activity. As captured on the recording, McFarlane told her interviewers that at first, she did not know EHC was going to become a pill mill. But after she learned how to do medication-assisted addiction treatment, she "got good at it" and "got educated about it" and it became clear EHC's prescribing practices were improper.

> SA Sullivan:  From somewhere in 2015 on, you're saying?
>
> McFarlane:  Yeah.
>
> SA Sullivan:  And so, all the last 3 years.

| | |
|---|---|
| McFarlane: | Yeah. |
| SA Sullivan: | The signs have been there, and actions have not been taken? |
| McFarlane: | Yeah. |
| SA Sullivan: | Okay . . . What is my argument going to be, cause you're potentially my star witness? |
| McFarlane: | Oh great. |
| SA Sullivan: | I don't know that we'll ever go to court, no one has been charged, you know. We're in the fact-finding phase, but what would the argument be from the defense attorney, who says to me well she made a million dollars there. She certainly knew everything that was going on. |

D.E. 432 at 4; Ex. 4 at 101-02. SA Sullivan testified he was explaining that, if they went to trial against Taylor and Herrell with McFarlane as the star witness, Taylor and Herrell could impeach her for her failure to leave the business once she realized she was embroiled in a criminal enterprise. SA Sullivan testified that McFarlane's response was essentially that she was naïve. She was not an addiction specialist before joining EHC, and Taylor and Herrell taught her how to do it. She told Sullivan she kept working at EHC because she needed the money. SA Sullivan testified that, although he told McFarlane she might be a trial witness, he did not promise her she would never be in trouble. And he observed that McFarlane continued to cooperate by participating in the September interview.

SA Sullivan testified he phoned McFarlane to set up the September 19, 2019 interview. He told her federal prosecutors would be attending and invited her to bring a lawyer. She chose the time and location (a different clinic where she worked, in Oak Ridge, Tennessee). The interviewers were SA Sullivan, AUSA Rosenberg, and AUSA Smith. McFarlane did not bring an attorney. SA Sullivan testified that he had told the prosecutors what McFarlane said in the March interview, and they were interested in asking more questions. SA Sullivan said Mr. Smith asked

most of the questions and Sullivan took notes. He said the prosecutors may have had the transcript of the March interview at that point, but probably not the recording.

SA Sullivan was asked about McFarlane getting emotional toward the end of the September interview after she was asked about her continuing involvement at EHC despite the red flags. In Sullivan's view, this discussion was similar to the one in March, in which he told McFarlane she would have liabilities as a witness. He testified it is difficult to use someone as a trial witness if they were a significant part of the alleged criminal acts. He testifies that the prosecutors did not start talking about indictments until some time after the September 19, 2019 interview.

According to SA Sullivan, McFarlane's 2019 interviews were "drastically different" from her 2016 interviews. In 2016, McFarlane explained that she and others at EHC were under investigation by the State of Tennessee about unauthorized patient volume, and she then discovered her name was being forged. In contrast, in 2019, McFarlane detailed a wide range of illegal activity—describing EHC as a "pill mill" where they were "moving people through like cattle" and patients were clearly diverting medication. *See* Ex. 4 at 5, 15, 27, 39, 56, 63. He was not expecting her to make so many additional accusations.

The defense asked SA Sullivan about the practice of designating interviewees as targets, subjects, and witnesses. He testified the DEA does not make those distinctions. It is not their own in-house terminology. He said those categorizations, as described in McFarlane's motion, are grand-jury issues that he is not involved with.

SA Sullivan testified he and the other interviewers never restrained McFarlane and never made threats, made promises, or raised their voices. He testified he had no intent to deceive her. He said McFarlane never asked her interviewers any questions about her "status," in terms of whether she would ever be charged with a crime.

14

SA Sullivan's testimony is uncontradicted.  It is consistent with the existing record.  And the Court finds his testimony credible.

## V.  Analysis

As a preliminary observation, if the Court were to apply the typical *Mahan* test, it would find the government had proven by a preponderance of the evidence that McFarlane's statements in the 2019 interviews were voluntarily made.  A normal voluntariness challenge would fail because there was no objectively coercive police activity.  It was McFarlane who went to the FBI first, and she traveled to their office for the two 2016 interviews.  The 2019 interviews at issue here were conducted at McFarlane's place of business in a room of her choosing.  She makes no claim she was in custody.  McFarlane was never restrained or threatened in any way.  No physical punishment or psychological tactics were used on her.  Instead, McFarlane spoke freely about her work at EHC and the red flags she observed there.  Under the totality of the circumstances, including McFarlane's personal characteristics, there is no indication of objectively coercive police tactics.

McFarlane can point to no objectively coercive behavior by her interviewers, which means the first essential element of voluntariness under *Mahan* is not satisfied.  *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

Instead, McFarlane relies largely on the Fourth Circuit case of *Giddins*.  Assuming the Sixth Circuit would agree with *Giddins*, the Court will accept McFarlane's invitation and focus on the *Giddins*-related body of law.  Her motion to suppress argues that the Court should apply the following standard to find in her favor:

> An investigator's failure to inform a defendant that he is the target of an investigation can result in affirmative deceit rising to the level of coercion.  *United States v. Giddins*, 858 F.3d 870, 883 (4th Cir. 2017).  Where the police "failed to inform [a] defendant that he was the subject of the investigation," and the agent's

15

behavior was "intended to mislead," the *Giddens* Court held that the ensuing statements were obtained involuntarily and therefore inadmissible. *Id.* at 887. In order to prevail on such a claim, the defendant must prove (1) that the deception was material in his decision to speak to the police and (2) produce clear and convincing evidence that the police affirmatively misled the defendant regarding the nature of the investigation. *Id.* at 884.

D.E. 402 at 7. This summary of *Giddins* does not tell the whole story. And the circumstances with McFarlane are quite different.[2]

## A. *Serlin* and *Giddins*

The *Giddins* Court relied on the earlier Seventh-Circuit *Serlin* decision. After Serlin was convicted for failing to file income tax returns, he appealed, arguing the trial court erred in denying his pretrial motion to suppress. *United States v. Serlin*, 707 F.2d 953, 955 (7th Cir. 1983). Agents had visited Serlin at home to interview him about an acquaintance named Stone. An agent "initially told [Serlin] that he was not the subject of any investigation, but after several minutes of conversation warned defendant of his right not to incriminate himself." *Id*. at 955. Serlin kept talking, and other interviews followed concerning another acquaintance of Serlin named Koenig and Serlin's apparent failure to file a return.

Serlin argued "he gave the statements in the mistaken belief that he was not the subject of the investigation," and this mistaken belief was "induced by the agents repeated references to their investigation of Stone and Koenig, which served to mask the true nature of their inquiry." *Serlin*, 707 F.2d at 956. The Seventh Circuit explained:

> To prevail on this point defendant must produce clear and convincing

---

[2] Although McFarlane's motion asks the Court to apply this standard (which places a clear-and-convincing-evidence burden on the defendant), at the evidentiary hearing, the defense took a different tack. Perhaps realizing the available evidence falls far short of meeting this burden, the defense asked the Court to adopt the *Serlin-Giddins* concept that mere misrepresentation can create coercion, but to apply it under the *Mahan* burden framework whereby the government must prove voluntariness by a preponderance of the evidence. As the Court explains herein, McFarlane's motion fails under either evidence/burden standard. But the *Serlin-Giddins* standard that places the burden on the defense to prove misrepresentation and materiality makes sense, given that the law generally permits law enforcement to deceive suspects. *See, e.g.*, *United States v. Kontny*, 238 F.3d 815, 817-18 (7th Cir. 2001). The Court declines to adopt the defense's hybrid approach to burden allocation in this case.

evidence that the agents affirmatively misle[]d him as to the true nature of their investigation. Defendant must also prove that the misinformation was material in his decision to speak with the agents. Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead.

*Id.* (citations and quotation marks omitted). The Court found that Serlin's statements "were not the product of affirmative deceit." *Id.* at 957. Serlin admitted he knew it was a criminal investigation. And the agents' "repeated questions concerning [Serlin's] apparent failure to file tax returns would have alerted even the most unsuspecting taxpayer that he was, at least partly, the focus of the search." *Id.*; *see also United States v. Greve*, 490 F.3d 566, 571-72 (7th Cir. 2007) (applying *Serlin* in a similar context).

The *Giddins* Court, in contrast, found that the defendant's *Miranda* waiver had been coerced through affirmative deceit.[3] But the circumstances went far beyond what happened in *Serlin*. Giddins had committed a bank robbery, and then loaned his car to friends who did two more robberies. *United States v. Giddins*, 858 F.3d 870, 874-75 (4th Cir. 2017). After the third robbery, Giddins's car was seized and an arrest warrant was issued for Giddins. *Id.* at 875. When Giddins went to retrieve his car from the police, two officers took him to an interview room with a running video camera. When one officer left, he audibly locked the door behind him. *Id.* at 875-76. After some questioning, Giddins asked, "Am I in trouble," to which the office responded, "No, you're here getting your car right?" *Id.* at 876. When he was presented with a *Miranda* waiver form, Giddins asked if what they were doing was "the procedure for me to get my car back," to which his interviewer replied, "Yeah," and said they needed to find out how the robbers "came into contact with your car." *Id.* at 877. Again, Giddins asked, "is this, like, the procedure for me

---

[3] The standards for due process voluntariness are the same standards applied for assessing the voluntariness of a *Miranda* waiver. *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016).

to get my car back," and the interviewer, Det. Taylor, responded:

> "Yeah—in order for us to ask you questions, because the vehicle was used in a crime, by law, we have to go over these rights. If we start asking you stuff and you don't want to talk to us, then don't talk to us. But we're just trying to figure out some issues." Giddins asked again, "But do I still get my car?" and Det. Taylor responded, "Before I release the car to you, I would like to know some answers. . . . I would like to know some answers before we release your car back to you." Giddins said, "That's what I'm asking," and then Det. Taylor told him, "We'll explain everything to you."

> Giddins then asked Det. Taylor, "I'm not in trouble or anything, am I?" Det. Taylor answered, "Not at this point, no. We'll find out what's going on. So long as you don't have—you know—you don't sit there and tell me you were hiding in the trunk and you escaped when the police pulled them over, no. Right? You weren't hiding in the trunk, were you?"

> When Giddins smiled and shook his head, Det. Taylor said, "Then what do you have to worry about?" Giddins said, "I don't have anything to worry about, I just don't like how I feel like I'm being interrogated—and y'all just—" and Det. Taylor interrupted, "You're not being interrogated, you're free—" to which Giddins interjected, "You gotta understand what I'm saying." Det. Taylor told him, "I know, I understand you, you're nervous. Because your car was used in a crime. I'd be nervous, too."

*Id.* at 877. *Giddins* was a *Miranda*-waiver case, and the Court first found that Giddins was in custody. *Id.* at 880-81. The Court then determined that the government failed to prove Giddins's waiver was voluntary.

First, the Fourth Circuit found the police had used coercive activity by threatening "economic consequences"—an inability to retrieve his car—if Giddins declined to waive his *Miranda* rights. *Id.* at 992-83. "Giddins relied on his car to get him to his job, and it was the means of maintaining his livelihood. . . . Det. Taylor's responses indicated that if Giddins failed to sign the *Miranda* waiver and answer questions, Giddins would not have had his car returned to him. As such, it was unduly coercive." *Id.* at 883.

Second, applying *Serlin*, the Court found affirmative deceit as to whether Giddins was the subject of the investigation. *Id.* at 883-84.

Giddins inquired twice whether he was in trouble—first to Det. Morano while Det. Morano was taking notes, and later to Det. Taylor when Giddins was presented with the *Miranda* waiver. Det. Morano responded, "No, you're here getting your car, right?" Det. Taylor told him, "Not at this point, no." The government argues that these responses by the officers were truthful. The government further suggests that "[h]ad Giddins asked if the police were planning to arrest him, the officer would have been obliged to answer yes. The government urges us to reach this conclusion on the basis that Giddins had not been formally arrested at the time Giddins inquired as to whether he was in trouble. This stretches the definition of "trouble" too far, and too narrowly distinguishes the case law.

At the time Det. Taylor entered the room, he had an arrest warrant in hand for Giddins. More to the point, Det. Taylor was the affiant on that warrant. And as acknowledged by the government, there is no evidence in the record to suggest that Det. Taylor was not going to execute that arrest warrant during his interview with Giddins.

We have no doubt that Giddins was "in trouble" when he asked both Det. Morano and Det. Taylor whether he was. The fact that an arrest warrant existed for Giddins and that Det. Taylor knew about and possessed the warrant meant that Giddins was, in fact, "in trouble" from the moment he walked into the police station. And the government has not produced evidence sufficient to carry its burden that would suggest that Det. Morano was not aware of the warrant. Once an arrest warrant issues, there is no question that the person named in that arrest warrant is "in trouble." Therefore, there can be no question that Det. Morano and Det. Taylor affirmatively misled Giddins as to the true nature of the investigation by failing to inform him that he was the subject of the investigation. This form of deceit thus constitutes coercion.

*Id*. at 884 (citations omitted).

Third, the Court determined that the coercive activity was sufficient to overbear Giddis's will. Giddins was experienced in the criminal justice system and the interview was short. Nevertheless, the "false pretenses" that Giddins was not "in trouble" and the pressure of the threat to keep his vehicle were enough to render his waiver involuntary. *Giddins*, 858 F.3d at 885. Finally, the Court found the error was not harmless and Giddins's conviction was reversed. *Id*. at 885-87; *see also United States v. Wilder*, 304 F. Supp. 3d 464, 471-72 (D. Md. 2018) (summarizing *Giddins*).

One court has commented that "the animating principle of the *Giddins* decision is that the

government may not threaten 'substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.'" *United States v. Adil*, No. 1:21-CR-277, 2022 WL 2161035, at *8 (E.D. Va. June 14, 2022) (quoting *Giddins*, 858 F.3d at 882). Another summed up *Giddins* as finding that the "defendant's will was 'overborne or his capacity for self-determination critically impaired' where he voluntarily went to the police station under the pretense of retrieving an impounded car, was repeatedly told that he was not under arrest or investigation, but was interrogated anyway." *United States v. Hutchins*, 361 F. Supp. 3d 779, 790–91 (E.D. Wis. 2019) (quoting *Giddins*, 858 F.3d at 885).

Westlaw and Nexis do not contain a single reference to *Serlin* or *Giddins* by a court in the Sixth Circuit.

## B. Application to This Case

In a typical case, the government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). However, in the unusual coercion-by-misrepresentation context, it is the defendant who "must produce clear and convincing evidence that the agents affirmatively mislead him as to the true nature of their investigation." *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983). And the defendant "must also prove that the misinformation was material in his decision to speak with the agents." *Id*. This clear-and-convincing-evidence standard (for coercion-through-misrepresentation claims) found in *Serlin* (which the Fourth Circuit applied in *Giddins*) is also present in the Eighth Circuit[4] and Sixth Circuit.[5] "Clear and convincing evidence" is an

---

[4] *United States v. Meier*, 607 F.2d 215, 217 (8th Cir. 1979) ("[The interviewer's] silence can only be considered fraudulent if there is clear and convincing evidence that it was intentionally misleading. . . . The burden of proof is upon the movant.").

[5] *United States v. Rutherford*, 555 F.3d 190, 194 (6th Cir. 2009); *United States v. Weekley*, 130 F.3d 747, 752 (6th Cir. 1997) ("[A] defendant must produce clear and convincing evidence that law enforcement officers purposely misled him as to the true nature of their investigation to prevail on a claim of government deception.").

intermediate standard greater than a preponderance of the evidence but less than beyond a reasonable doubt. EVIDENCE, Black's Law Dictionary (11th ed. 2019). It means "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain." *Id.* Clear and convincing evidence is evidence that places in the factfinder an abiding conviction that the truth of one's factual contentions are highly probable. *State of Fla. v. State of Georgia*, __ U.S. __, 141 S. Ct. 1175, 1180 (2021).

McFarlane has not met this burden. The defense has not produced clear and convincing evidence of affirmative misrepresentation as to the nature of the investigation. Nor has it pointed to competent evidence of materiality.

First, some cases in the *Serlin* and *Giddins* world focus on whether the defendant was misled as to whether criminal charges (as opposed to some sort of administrative action) were possible. This is not one of those cases where the defendant was understandably confused as to whether criminal charged could materialize. Any reasonable person in McFarlane's position would understand that any investigation of EHC was potentially criminal in nature. McFarlane went to the FBI. She told them her name was fraudulently being added to prescriptions and other medical documents. She was interviewed by criminal-justice personnel—agents of the FBI, HHS OIG, and federal prosecutors. Clearly, a person in McFarlane's situation (a physician married to an FBI agent) would know potential federal criminal charges were on the table from the get-go.

Second, McFarlane must have been aware of *her own* potential criminal liability. First, before going to the FBI, she knew she was on state regulators' radar for her own red-flag-raising behavior involving narcotics. McFarlane's second interview (August 9, 2016) involved an FBI agent and a HHS-OIG agent. According to the government's brief,

> In that interview, McFarlane divulged that on July 22, 2016 – approximately 1 week
> before her interview with the FBI – the Tennessee Department of Health notified

> her about an investigation of her practices at EHC. She described the investigation as relating to the number of patents she saw in 2014 and 2015, which greatly exceeded the 100 patients she was permitted to see under her DEA registration and DATA 2000 waiver.

D.E. 432 at 2. The reports of the August 2016 interviews were introduced at the hearing, and they both memorialize that McFarlane was aware of the state investigation prior to contacting federal officials. Ex. 1, 2. SA Sullivan also testified he knew that two state investigations were opened against McFarlane before she contacted the FBI—one by the Tennessee Department of Health, and the other by TennCare, which Sullivan described as "Tennessee's Medicaid."

To borrow language from *Giddins*, what this means is McFarlane knew she was potentially "in trouble" before she ever went to the FBI to talk about EHC. It may be that the TennCare investigation and the Tennessee Department of Health investigation were non-criminal in nature, but this matters not. McFarlane would have been aware that the issues being investigated were also criminal violations.

McFarlane's story is not the story of a defendant tricked into inculpating herself by sneaky investigators hiding their cards. No, the story here is about a doctor who knew she was under investigation by the regulatory authorities and apparently hoped to avoid criminal charges by offering to cooperate with law enforcement against her colleagues. McFarlane consistently reported to her interviewers that criminal behavior was occurring at EHC. This started with her reports of forgery of her signature, and escalated in the 2019 interviews into reports of diversion and fraud. In sum, it appears that McFarlane was, at least in part, motivated to cooperate with law enforcement in the hope of avoiding criminal prosecution for her own actions. Because McFarlane was doubtless aware of her own potential criminal liability concerning the alleged shenanigans at EHC, she cannot obtain suppression under the *Serlin-Giddins* line of cases. This finding alone is

sufficient for denial of her motion.[6]

Third, McFarlane has not identified any affirmative misrepresentations about her potential criminal liability. This case is not like Giddins's, who asked if he was in trouble, and was flatly told "no." The record does not show McFarlane ever *asking* her interviewers if she is in trouble, if she is under investigation, or if she is a "target." And the defense conceded at the hearing there was no evidence any interviewer was untruthful to McFarlane about the investigation.

The *Serlin* and *Giddins* line of cases hold that affirmative misrepresentation—proven by clear and convincing evidence—is necessary to obtain suppression on this theory. After surveying the case law, one court concluded that "Statements are suppressed for reasons of deceit or trickery *only in the presence of an affirmative misrepresentation, such as an outright and material lie*." *United States v. La Forgia*, No. 12-CR-57-WS-C, 2012 WL 1869035, at *3 (S.D. Ala. May 22, 2012) (emphasis added). Additionally, the Sixth Circuit has indicated that involuntariness by deception depends on evidence the defendant was "in fact compelled to talk by the government's affirmative misrepresentation." *United States v. Rutherford*, 555 F.3d 190, 195 (6th Cir. 2009). As *Serlin* itself demonstrates, merely naming other people as targets does not equate to affirmative misrepresentation. Nor does silence as to whether the defendant is a target amount to affirmative misrepresentation. Per *Serlin*, "Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Serlin*, 707 F.2d at 956. "Mere silence by law enforcement agents as to the criminal aspect of their investigation has been routinely held not to constitute the sort of affirmative misrepresentation that might give rise to a viable motion to suppress." *La Forgia*,

---

[6] For the fourth interview in particular, McFarlane must have been aware of potential criminal liability because she was invited to bring a lawyer (but she declined). D.E. 432 at 7.

2012 WL 1869035, at *4.    And *Giddins* has been summarized as finding that Giddins's "will was 'overborne or his capacity for self-determination critically impaired' where he voluntarily went to the police station under the pretense of retrieving an impounded car, was repeatedly told that he was not under arrest or investigation, but was interrogated anyway." *United States v. Hutchins*, 361 F. Supp. 3d 779, 790–91 (E.D. Wis. 2019) (quoting *Giddins*, 858 F.3d at 885). Further, in *Giddins*, the officers possessed an arrest warrant prior to the interview.

Nothing of the sort is even alleged to have happened here.  This record contains no repeated assurances that McFarlane was not under investigation or in trouble.  In sum, there is no factual basis for finding an "affirmative misrepresentation" in this record, so there is no justification for suppression under the *Serlin-Giddins* rule.  Much less is there "clear and convincing evidence that the agents affirmatively mislead [McFarlane] as to the true nature of their investigation." *Serlin*, 707 F.2d at 956.  The defense conceded at the end of the November 17 evidentiary hearing that they had no evidence of the interviewers saying anything that was actually false to McFarlane. The lack of affirmative misrepresentation alone provides sufficient reason for denial of suppression.

Fourth, even if there was affirmative misrepresentation or its equivalent, the defense has presented no evidence that any such misrepresentation was *material* to McFarlane's decision to cooperate so whole-heartedly.  As McFarlane's brief points out, under *Serlin* and *Giddins*, the defendant also bears the burden of proving materiality.  D.E. 402 at 7; *Giddins,* 858 F.3d at 884; *Serlin*, 707 F.2d at 956.  The defense essentially conceded at the evidentiary hearing that, because McFarlane declined to testify, they had no competent evidence of materiality.  Argument was made that the Court can infer materiality from the record, but this is neither supported by the record nor clear and convincing proof.  Thus, an essential element of a *Serlin-Giddins* claim of coercion by

misrepresentation is lacking here. Under that framework, this fact alone provides a sufficient reason for denying suppression.

Fifth, in the alternative, even if the interviewers had made affirmative misrepresentations (and they did not), the misrepresentations would have been insufficient to overbear McFarlane's will. "It is not enough . . . to simply find coercion. . . . The coercion must rise to a level such that the defendant's will has been overborne or his capacity for self-determination critically impaired." *Giddins*, 858 F.3d at 885 (citation omitted).

In this case, McFarlane herself went to the authorities. She instigated the first two interviews at the Knoxville FBI office. And then followed the two DEA interviews at her own medical offices. When it comes to whether a suspect's will was overborne, courts look to the totality of the circumstances, with relevant factors including the defendant's age, education and intelligence; whether the defendant has been informed of constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999). In 2019, McFarlane was a 46-year-old physician, running her own clinic, and married to a veteran FBI agent. She is an intelligent and educated high achiever. She was not subject to any physical oppression or deprivation. She does not allege any psychological trickery was used against her. She merely suggests she was not informed she was a target. The circumstances of this case fall far, far short of indicating her will was overborne.

McFarlane, of course, floats the novel theory that she was unusually susceptible to manipulation under the circumstances *because of* her education, intelligence, and insight (via her husband) into criminal investigations. She says the government's agents knew these circumstances and exploited them to their advantage—rendering her incriminating statements involuntary. She

claims she reasonably believed she and law enforcement were on the same "team," so she should never have had any fear of being charged. McFarlane fails to thread the needle on this theory. McFarlane points to no case law suggesting that a person's intelligence, education, and insight can weigh *in favor* of a finding of coercion. As previously noted, this is not the story of conniving investigators tricking a defendant into inculpating herself. This is the story of a an intelligent, insightful, and experienced person realizing she might be neck deep in a criminal conspiracy—she herself suggested EHC was a "pill mill"—and trying to escape before the hammer fell by rushing to cooperate with the authorities. Making strategic moves to avoid or minimize her own criminal liability through cooperation is quite the opposite of government coercion. The fact that McFarlane's will was not overborne, standing alone, provides a sufficient basis for denying suppression.

Sixth, this case lacks a crucial component of *Giddins*, which is that the police in *Giddins* used economic coercion to extract a *Miranda* waiver. A Virginia District Court found that "the animating principle" of *Giddins* is "that the government may not threaten 'substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.'" *United States v. Adil*, No. 1:21-CR-277, 2022 WL 2161035, at *8 (E.D. Va. June 14, 2022) (quoting *Giddins*, 858 F.3d at 882). Here, no penalty was threatened to coerce McFarlane into speaking with the authorities. To the extent *Giddins* depends on the invocation of substantial economic penalties, it has no applicability in this case.

McFarlane has failed to produce clear and convincing evidence of affirmative misrepresentation sufficient to overbear her will. There are no affirmative misrepresentations in this case. As such, there is also no evidence that any affirmative misrepresentation was material to McFarlane's decision to speak to government officials. Instead, the evidence preponderates in

favor of voluntariness.  Suppression is not warranted.

### C.  DEA and DOJ Policy

McFarlane points to the DOJ Justice Manual and argues that her interviewers' behavior violates longstanding policies regarding the difference between witnesses, subjects, and targets. D.E. 402 at 9-10.  The question of whether or not interviewers followed their own administrative policies is not relevant to voluntariness.  In *Rutherford*, the Sixth Circuit found that IRS agents had negligently violated their own manual in their questioning of the defendant.  But "the Constitution does not demand a bright-line rule whereby every breach of federal administrative policy also violates the Due Process Clause.  The Fifth Amendment is implicated only when a federal agent's conduct actually compels a person to speak against his will."  *United States v. Rutherford*, 555 F.3d 190, 192 (6th Cir. 2009).  Even if the government commits misconduct, "the effect of the government misconduct on the defendants, not its mere existence, is what must guide our analysis."  *Id*. at 195.  As explained in the previous section, McFarlane's will was not overborne, so any departure from policy by her interviewers does not translate into suppression of her statements.

### VI.  Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendant Keri McFarlane's motion to suppress (D.E. 402) be **DENIED.**   McFarlane has not produced clear and convincing evidence that the agents affirmatively mislead her as to the true nature of their investigation or that any such misinformation was material in her decision to speak with the agents. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983).   Further, the evidence preponderates in favor of voluntariness.

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. The approaching trial date and delays in processing McFarlane's motion necessitate a shortened objections period. Any objection must be filed **on or before November 30, 2022**. Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of that deadline, this matter will be submitted to Judge Van Tatenhove for his consideration.

This the 21st day of November, 2022.

Signed By:

*Hanly A. Ingram*

**United States Magistrate Judge**